FILED

2023 Feb-28  PM 05:28
U.S. DISTRICT COURT
N.D. OF ALABAMA

# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ALABAMA
# SOUTHERN DIVISION

| | | |
|---|---|---|
| **SARAH ISMAIL,** | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case: 2:21-cv-01204-AMM** |
| | ) | |
| **VOESTALPINE RAILWAY** | ) | |
| **SYSTEMS NORTRACK, INC.,** | ) | |
| **Defendant.** | ) | |

---

## DEFENDANT'S MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

---

**COUNSEL FOR DEFENDANT**

F. Daniel Wood Jr. (ASB-6822-D65F)
John W. Sheffield (ASB-7423-D62J)
THE KULLMAN FIRM
600 University Park Place, Suite 340
Birmingham, AL 35209
T: 205-871-5858 | F: 205-871-5874
fdw@kullmanlaw.com
jws@kullmanlaw.com

# **TABLE OF CONTENTS**

I.      INTRODUCTION……………………………………………… …1

II.     STATEMENT OF FACTS……………………………………………1

III.    ARGUMENT……………………………………………………...15

        A.      Summary Judgment Standard…………………………………15

        B.      Plaintiff's Discriminatory Termination Claim Fails as a Matter of

                Law……………………………………………………………16

        C.      There is no Hostile Environment Claim…………………………26

IV.     CONCLUSION…………………………………………………………30

COMES NOW Defendant, voestalpine Railway Systems Nortrak, LLC, incorrectly named in the Complaint as Voestalpine Railway Systems Nortrack, Inc. ("Nortrak" or "Defendant") and submits the following Memorandum in support of its Motion for Summary Judgment, filed contemporaneously herewith.

## I.    INTRODUCTION

Defendant recruited Plaintiff Sarah Ismail while she was in college, hired her as an intern, gave her part time work to support her as a student, and then, after graduation, hired her as a full-time design engineer to work on a diverse local team. Defendant's design organization was under significant pressure to increase performance, and unfortunately, Plaintiff made mistakes and simply did not progress sufficiently to make the cut in that environment.   Plaintiff's former supervisor and her next-level manager are also female, and they are the same persons who were instrumental in hiring her in the first place.  She now accuses them of unlawful gender/sex discrimination in her termination, essentially, based solely on her own perceptions of her performance.  However, the evidence establishes that Defendant's decision was legitimate, that there was no improper bias against Plaintiff, and that there are no material disputes appropriate for trial.  Plaintiff has no evidence of sex discrimination.  Accordingly, Defendant is entitled to judgment here as a matter of law.

## II.    STATEMENT OF FACTS

Defendant designs and manufactures track railwork for the railway industry, and has various facilities in North America, including in Birmingham, Alabama. (Ex. C--Schmidt Decl., ¶ 1, Doc. 19-35, p. 1). Stacey Schmidt is the Senior Vice President Technology for Defendant and Schmidt had supervisory responsibility over the engineering employees at the Birmingham facility throughout the time period that Plaintiff was employed with Nortrak. (Ex. C--Schmidt Decl., ¶¶ 1-2, Doc. 19-35, p. 1). Schmidt has responsibility for the areas of Research and Development, Quality Assurance, and Central Engineering. (Ex. C--Schmidt Decl., ¶ 1, Doc. 19-35, p. 1). Schmidt was responsible for promoting Jennifer McIntire into the Engineering Project Lead position in Birmingham. (Ex. C--Schmidt Decl., ¶ 4, Doc. 19-35, p. 1). McIntire reported to Schmidt and directly supervised Plaintiff on-site in Birmingham throughout her employment with Nortrak. (Ex. C--Schmidt Decl., ¶ 4, Doc. 19-35, p. 1).

As a college student, Plaintiff initially applied for an internship position at Nortrak on December 13, 2017. (Ex. A--Plaintiff's Depo., p. 77, Ex. 3, Doc. 19-1, p. 20, Doc. 19-4, pp. 1-10). In response to her application, McIntire and other Birmingham managers recruited her, and interviewed her at a job fair at her college. (Ex. A--Plaintiff's Depo., pp. 77-78, Doc. 19-1, pp. 20-21; Ex. C--Schmidt Decl., ¶ 4, Doc. 19-35, p.1). Nortrak offered Plaintiff an internship position at Nortrak's Birmingham facility, which began on June 15, 2018. (Ex. A--Plaintiff's Depo., pp.

78-79, 85, Doc. 19-1, pp. 21-22).   Schmidt and McIntire both supported hiring Plaintiff as a full time employee after her graduation, and she began working full-time as a design engineer on June 19, 2019.  (Ex. C--Schmidt Decl., ¶ 4, Doc. 19-35, p. 1).

There were six employees in the Engineering Department when Plaintiff began working at Nortrak—Plaintiff, two other females, and three males.   (Ex. A--Plaintiff's Depo., pp. 72-73, Doc. 19-1, p. 19).  Plaintiff concedes that there was only one other design engineer in the department who had less experience than her.  (Ex. A--Plaintiff's Depo., p. 72, Doc. 19-1, p. 19).

When Plaintiff was first hired by Nortrak, she was given its Code of Conduct, which sets out a clear policy prohibiting discrimination, harassment, and retaliation. (Ex. A--Plaintiff's Depo., pp. 86-88, Exs. 4-6, Doc. 19-1, p. 23, Doc.19-5-7).  She was aware that she was responsible to report any misconduct or violation of the Code of Conduct and that she could go to her immediate supervisor, the supervisor above that level, Human Resources, or to other corporate resources, with any concerns. (Ex. A--Plaintiff's Depo., p. 88, Doc. 19-1, p. 23).   Plaintiff watched a video about the company's policy prohibiting discrimination and harassment. (Ex. A--Plaintiff's Depo., pp. 88-89, Doc. 19-1, p. 23).  Plaintiff also received a copy of Nortrak's policy document which prohibits any type of discrimination and harassment and requires that any perception of that type of activity be immediately reported.  (Ex.

A--Plaintiff's Depo., p. 89, Exs. 7-8, Doc. 19-1, p. 23, Doc. 19-8-9).  In addition, Plaintiff received a terms and condition employment book, which contained Nortrak's open-door policy.  (Ex. A--Plaintiff's Depo., pp. 116-18, Exs. 12-13, Doc. 19-1, pp. 30-31, Doc. 19-13-14).  Plaintiff even received additional training on Nortrak's anti-discrimination and anti-harassment policy, on December 17, 2019. (Ex. A--Plaintiff's Depo., pp. 162-63, Doc. 19-1, p. 42).  Plaintiff never complained to anyone at Nortrak that she believed she was experiencing discrimination or harassment based on sex.  (Ex. C--Schmidt Decl., ¶ 16, Doc. 19-35, p. 3).

Beginning in the Fall of 2018, Nortrak gave Schmidt a long-term initiative to increase the efficiency and decrease the time required for its design engineering work.  (Ex. C--Schmidt Decl., ¶ 5, Doc. 19-35, p. 1).  Manufacturing production, and the ultimate delivery of product to Defendant's customers was being delayed as a result of the passage of too much time in the design phase.  (Ex. C--Schmidt Decl., ¶ 5, Doc. 19-35, p. 1).  Schmidt's team, including the design group in Birmingham, is responsible for design engineering, which occurs after an order is placed, but before it can be manufactured.  (Ex. C--Schmidt Decl., ¶ 5, Doc. 19-35, p. 1).  A new design engineer generally starts with more rudimentary tasks and is given more complex work assignments as their proficiency increases.  (Ex. C--Schmidt Decl., ¶ 6, Doc. 19-36, pp. 1-2).  Because of the company's initiative to increase the velocity of design work, however, Schmidt did not have the luxury of providing extra help

or time to particularly slow learners. (Ex. C--Schmidt Decl., ¶ 6, Doc. 19-35, pp. 1-2).

Unfortunately, Plaintiff did not meet Nortrak's expectations with respect to the accuracy of her work, her production was inadequate, and her development as a designer was too slow. (Ex. C--Schmidt Decl., ¶ 7, Doc. 19-35, p. 2). Schmidt made the decision to terminate Plaintiff's employment for performance reasons, effective March 10, 2020. (Ex. C--Schmidt Decl., ¶ 7, Doc. 19-35, p. 2).

Shortly after Plaintiff was hired for full-time employment, Schmidt visited the Birmingham facility and walked around the facility with Plaintiff. (Ex. C--Schmidt Decl., ¶ 8, Doc. 19-35, p. 2). Plaintiff told Schmidt on this occasion that she was unsure of herself and thought she made the wrong decision by moving to Birmingham because she was missing home. (Ex. C--Schmidt Decl., ¶ 8, Doc. 19-35, p. 2). She also told Schmidt that she was unhappy with the manufacturing environment, which is the nature of Nortrak's business, and she was unhappy with performing the basic tasks of her job. (Ex. C--Schmidt Decl., ¶ 8, Doc. 19-35, p. 2).

Schmidt supervised McIntire's training of employees of the design team in Birmingham. (Ex. C--Schmidt Decl., ¶ 9, Doc. 19-35, p. 2). McIntire spoke with Schmidt on a daily basis about the design engineers on her team, including Plaintiff, and kept a log about their training, which she shared with Schmidt. (Ex. C--Schmidt Decl., ¶ 9, Doc. 19-35, p. 2). McIntire noted that Plaintiff was resistant to efforts to

train her from the beginning of her employment and reacted negatively to efforts to train her on a particular engineering technique in mid-October 2019.  (Ex. C--Schmidt Decl., ¶ 9, Ex. 1, Doc. 19-35, pp. 2, 6-8).

Plaintiff testified that McIntire told her at unspecified times that her hair was messy, she was talked to about wearing sweatpants on three or four occasions, and that she was also talked to about wearing steel-toed boots on the shop floor.  (Ex. A--Plaintiff's Depo., pp. 65-66, Doc. 19-1, pp. 17-18).  She testified that McIntire told her that she needed to dress "more like an office setting."  (Ex. A--Plaintiff's Depo., p. 66, Doc. 19-1, p. 18).  Plaintiff also testified that "Vicky from HR" talked to her about not wearing a bra on her first day of work.  (Ex. A--Plaintiff's Depo., p. 67, Doc. 19-1, p. 18).  Plaintiff is not aware if anyone else was counseled, coached, reprimanded, or issued a disciplinary action for anything they were wearing or not wearing.  (Ex. A--Plaintiff's Depo., p. 207, Doc. 19-1, p. 53).  McIntire did talk to Plaintiff about wearing close-toed shoes and wearing sweatpants to work.  (Ex. C--Schmidt Decl., ¶ 17, Doc. 19-35, p. 3).  McIntire also talked to Plaintiff about sleeping at her desk and coming to work late.  (Ex. C--Schmidt Decl., ¶ 17, Doc. 19-35, p. 3).  Vicky from HR did, in fact, talk to Plaintiff on the very first day of her internship, about wearing a revealing shirt and no bra.  (Ex. D--Corp. Rep. Depo., Ex. 3, Doc. 19-39, p. 6).

In about October 2019, Plaintiff sent Schmidt a list of issues and complaints about McIntire's management style. (Ex. C--Schmidt Decl., ¶ 12, Ex. 2, Doc.19-35, pp. 2, 9-12; Ex. A--Plaintiff's Depo., pp. 120-21, Ex. 14, Doc. 19-1, p. 31, Doc. 19-15, pp. 1-5). Plaintiff complained that McIntire's actions were unproductive, her tone of voice was disruptive, and that customers and coworkers commented on her tone. (Ex. C--Schmidt Decl., ¶ 12, Ex. 2, Doc. 19-35, pp. 2, 9-12,; Ex. A--Plaintiff's Depo., Ex. 14, Doc. 19-15, pp. 1-5). She complained that employees in the engineering department had to log into an excel sheet to document the projects they were working on, made a comment about Plaintiff's food stinking, questioned her spelling on a document, and told her during a meeting she was not going to repeat something after she had just announced that she was not going to repeat it. *Id.* Schmidt and local Human Resources Manager Michael Soeherman met with Plaintiff about the complaint at the Birmingham facility on October 23, 2019. (Ex. C--Schmidt Decl., ¶ 13; Doc. 19-35, p. 3 Ex. A--Plaintiff's Depo., pp. 121-22, Doc. 19-1, pp. 31-32). Plaintiff testified that she told Schmidt and Soeherman on October 23 about the examples she included in her written complaint. (Ex. A--Plaintiff's Depo., p. 142, Doc. 19-1, p. 37). They discussed the training she was going through and Schmidt explained to her that designers spend a long time on basic concepts before moving on to more complicated components. (Ex. C--Schmidt Decl., ¶ 13-14, Ex. 3, Doc. 19-35, pp. 3, 13-17; Ex. A--Plaintiff's Depo., pp. 145-46, Doc. 19-

1, pp. 37-38).  Plaintiff perceived that Jacob was doing more advanced work, but she testified that she did not know when he started design work, did not know what type of experience he had with the type of systems used at Nortrak and did not know anything about his technical abilities or educational background before he came to Nortrak.  (Ex. A--Plaintiff's Depo., pp. 147-48, Doc. 19-1, p. 38).  Schmidt told Plaintiff on this occasion that they had spoken to McIntire, who informed them that she had not intended to offend Plaintiff.  (Ex. C--Schmidt Decl., ¶ 14, Doc. 19-35, p. 3).  After Plaintiff told them that McIntire was not professional, Schmidt asked her what she meant by "professional," and Plaintiff could not give them a definition.  (Ex. C--Schmidt Decl., ¶ 14, Doc. 19-35, p. 3).  Plaintiff mentioned that she and McIntire had been friends and had a "falling out" at the end of August 2009.  (Ex. C--Schmidt Decl., ¶ 14, Doc. 19-35, p. 3).  Schmidt and Soeherman asked Plaintiff if there were anything else she would like to see or expect them to do and she said "no."  (Ex. C--Schmidt Decl., ¶ 14, Doc. 19-35, p. 3).

Schmidt had a second conversation with Plaintiff on October 23.  (Ex. C--Schmidt Decl., ¶ 15, Doc. 19-35, p. 3).  Most of this conversation revolved around her difficulties with her co-workers.  (Ex. C--Schmidt Decl., ¶ 15, Doc. 19-35, p. 3).  She again, however, mentioned that McIntire was unprofessional, but again, could not define what she meant.  (Ex. C--Schmidt Decl., ¶ 15, Doc. 19-35, p. 3).  Ismail admitted during this meeting that she was not professional either.  (Ex. C--Schmidt

Decl., ¶ 15, Doc. 19-35, p. 3).  Plaintiff yelled and cried during this meeting on several occasions.  (Ex. C--Schmidt Decl., ¶ 15, Doc. 19-35, p. 3).  Plaintiff did not indicate during these meetings or at any other time that she believed she was experiencing any type of sex discrimination or harassment.  (Ex. C--Schmidt Decl., ¶ 16, Doc. 19-35, p. 3).

McIntire and Soeherman had a conversation with Plaintiff on November 1, 2019, because somebody from the shop reported seeing her asleep at her cubicle.  (Ex. A--Plaintiff's Depo., pp. 161-62, Doc. 19-1, pp. 41-42).  Plaintiff claims that she did so because she did not feel safe driving home in the rain.  *Id*.

Plaintiff complains that she was not included in an impromptu meeting held by McIntire on one occasion when she was away from her desk.  (Ex. A--Plaintiff's Depo., pp. 129-30, Doc. 19-1, pp. 33-34).  She testified that one of the other male engineers was not at the meeting either, and that the other two female engineers were present at the meeting.  (Ex. A--Plaintiff's Depo., pp. 137-38, Doc. 19-1, pp. 35-36).  There was also a meeting about a railroading convention in which Plaintiff was not included, because she was not going to be included on the trip.  (Ex. A--Plaintiff's Depo., pp. 139-41, Doc. 19-1, p. 36).  One of the other employees included was a less experienced female whose name Plaintiff could not recall.  (Ex. A--Plaintiff's Depo., p. 140, Doc. 19-1, p. 36).  When asked if she was aware of any facts suggesting that Schmidt assigned outside training based on factors other than skillset

and seniority, Plaintiff testified she was not sure and did not know that Schmidt was even making those decisions. (Ex. A--Plaintiff's Depo., pp. 170-71, Doc. 19-1, p. 44).

Plaintiff sent an email to Schmidt in January 2020 asking to be considered for out-of-state training, without mentioning any specific training. (Ex. A--Plaintiff's Depo., p. 166, Ex. 18, Doc. 19-1, p. 43, Doc. 19-19). Schmidt explained to her that training outside of Birmingham comes with time and that there are limited spots available. (Ex. C--Schmidt Decl., ¶ 19, Doc. 19-35, p. 3). Schmidt encouraged Plaintiff to continue to work with McIntire to develop her skillset and they would send her to training as she progressed. (Ex. C--Schmidt Decl., ¶ 19, Doc. 19-35, p. 3). Plaintiff was apparently upset that two other engineers from Birmingham, Jacob Jordan, a male, and Taylor Sabol, a female, had been chosen to go to training in Illinois. (Ex. C--Schmidt Decl., ¶ 19, Doc. 19-35, pp. 3-4). Schmidt chose those two employees for the training because, unlike Plaintiff, they had been overachieving and excelling, and their skillset showed they were likely to benefit from the program. (Ex. C--Schmidt Decl., ¶ 19, Doc. 19-35, pp. 3-4). McIntire was not involved in selecting these employees for the training. (Ex. C--Schmidt Decl., ¶ 19, Doc. 19-35, p. 4). Plaintiff does not have any records of any training received by any other Nortrak employees. (Ex. A--Plaintiff's Depo., pp. 174-75, Doc. 19-1,

p. 45).[1]    Defendant provided Plaintiff with all of the on-the-job training commensurate with the training that a design engineer with her level of experience should have received.  (Ex. C--Schmidt Decl., ¶ 20, Doc. 19-35, p. 4).

Plaintiff asked Defendant to purchase some study materials for her, to prepare for and take the FE exam, which Defendant did.  (Ex. A--Plaintiff's Depo., pp. 171-172, Ex. 19, Doc. 19-1, p. 44, Doc. 19-20).  However, Plaintiff never took the exam.  (Ex. A--Plaintiff's Depo., pp. 173-74, Doc. 19-1, pp. 44-45).

In January 2020, McIntire coached Plaintiff about not turning in her signed performance evaluation, not completing her Skills Matrix, and gossiping with other employees.  (Ex. C--Schmidt Decl., ¶ 21, Doc. 19-35, p. 4).  In mid-January 2020, Plaintiff continued to express frustration with McIntire, stating that she was uncomfortable around her, and she openly expressed disapproval of her in the presence of co-workers.  (Ex. C--Schmidt Decl., ¶ 21, Doc. 19-35, p. 4).  Schmidt believed that Plaintiff needed more direction from McIntire, not less, as she seemed to desire.  (Ex. C--Schmidt Decl., ¶ 21, Doc. 19-35, p. 4).

On February 18, 2020, Plaintiff made a critical error in a design, which required the production department to re-work a project.  (Ex. C--Schmidt Decl., ¶ 22, Doc. 19-35, p. 4).  She had created a design for some hollow steel ties (HST) that had

---

[1] The training program out of state never actually occurred, because of COVID, and other out-of-state training for design engineers from the Birmingham facility has occurred on only two other occasions.  (Schmidt Decl., ¶ 20).

drilling in the radius, which was incorrect and required production to re-work to re-drill the HST in an appropriate flat position, so that the hardware could be sealed properly.  (Ex. C--Schmidt Decl., ¶ 22, Doc. 19-35, p. 4).  Ismail essentially put a fastener in a curve of the rail, which is not done in railway engineering.  (Ex. C--Schmidt Decl., ¶ 22, Doc. 19-35, p. 4).  If an error of this magnitude had not been corrected, it could have caused a material failure of track, and train derailment. (Ex. C--Schmidt Decl., ¶ 22, Doc. 19-35, p. 4).  When it was explained to Plaintiff what the issue was and how it would be fixed, she refused to accept responsibility and did not understand what remedial measures needed to take place.  (Ex. C--Schmidt Decl., ¶ 22, Doc. 19-35, p. 4).

Also around this time, Plaintiff sent out emails with unclear instructions that led to confusion for the production department.  (Ex. C--Schmidt Decl., ¶ 23, Doc. 19-35, p. 4).  Schmidt viewed this as another example of Plaintiff not paying attention to details or providing accurate information, which are critical in engineering.  (Ex. C--Schmidt Decl., ¶ 23, Doc. 19-35, p. 4).

Plaintiff continued to struggle with basic tasks, and could not complete tasks in a timely basis, such as putting together a flash drive for McIntire, not following the correct protocol for customer submittals, not recognizing a railroad tie, continually relying on co-employees for help, which took away from their productive time, and not remembering key points from the extensive training she had received.  (Ex. C--

Schmidt Decl., ¶ 24, Doc. 19-35, p. 4).  Based on Schmidt's concerns regarding

Plaintiff's performance and progress, and in light of McIntire's continuing concerns,

Schmidt reached out privately to Bill Selvidge, the most accomplished and most

experienced designer in Birmingham, for an independent assessment of Ismail's

work.  (Ex. C--Schmidt Decl., ¶ 25, Doc. 19-35, pp. 4-5). Selvidge reported that

Plaintiff was continually making mistakes, even with step-by-step instruction, that

she struggled with understanding basic concepts of designs, and that she made

mistakes with, or could not do, basic math.  (Ex. C--Schmidt Decl., ¶ 25, Doc. 19-

35, pp. 4-5).

Schmidt concluded that Ismail's productivity was insufficient, there were serious

issues with the accuracy of her work, she was not meeting the job requirements, and

was not likely to do so in the timeframe Nortrak needed, so Schmidt made the

decision to terminate her employment, which was effective March 10, 2020.  (Ex.

A--Plaintiff's Depo., pp. 36-37, Doc. 19-1, p. 10; Ex. C--Schmidt Decl., ¶¶ 7, 26,

Doc. 19-35, pp. 2, 5).  Plaintiff was informed of the decision by local Human

Resources Manager Michael Soeherman and Vice President of Risk Management

Clay Johnston.  (Ex. A--Plaintiff's Depo., pp. 36-37, Doc. 19-1, p. 10).

**Plaintiff is not aware of any facts which indicate or even suggest that**

**Schmidt was biased or motivated to take any action against her, because she is**

**female.**  (Ex. A--Plaintiff's Depo., p. 125, Doc. 19-1, p. 32).  Likewise, when asked

why she believed McIntire might be motivated to take any action against her, because she is a female, Plaintiff could only speculate that, "[s]he possibly could have felt threatened. You know, I'm a young female so just I guess how much I've grown within the company. Maybe she felt threatened that I was going to accelerate or become too successful and she was trying to kind of limit that or control that." (Ex. A--Plaintiff's Depo., p. 186, Doc. 19-1, p. 48). When asked why McIntire would she not want a female to be successful within the company, Plaintiff testified, "I'm unsure." *Id*. Instead, Plaintiff admits that her perception of hostility from McIntire began after an interpersonal conflict that had nothing to do with sex/gender. (Ex. A--Plaintiff's Depo., pp. 203-04, Doc. 19-1, p. 52).

McIntire's manager, Schmidt, is not aware of any facts which would indicate or even possibly suggest that McIntire was biased against, hostile towards, or less favorable to, female employees, as opposed to male ones. (Ex. C--Schmidt Decl., ¶ 29, Doc. 19-35, p. 5). In fact, during Plaintiff's tenure at Nortrak, McIntire supported female design engineer Taylor Sabol, including in her performance evaluations, merit increases, and training, and was highly complementary of her performance and progression. (Ex. C--Schmidt Decl., ¶ 29, Doc. 19-35, p. 5). On the other hand, McIntire was critical of and brought to Schmidt's attention performance issues involving male employees. (Ex. C--Schmidt Decl., ¶ 29, Doc. 19-35, p. 5).

As noted, Schmidt, not McIntire, made the decision to terminated Plaintiff.  (Ex. C--Schmidt Decl., ¶ 7, 25, 26, Doc. 19-35, pp. 2, 4-5).  For Schmidt's part, she was promoted by Nortrak from Director to Vice President, she herself promoted McIntire to Engineering Project Lead, she has promoted Birmingham design team member Taylor Sabol (female) to the Designer II position (and plans to promote her again next month), her most recent hire for design engineer in Birmingham is an African American female, and she has terminated male and female designers for performance reasons.  (Ex. C--Schmidt Decl., ¶¶ 4, 27, 29, Doc. 19-35, pp. 1, 5).  Plaintiff's gender was not a factor, and played no role whatsoever, in the decision to terminate her employment.  (Ex. C--Schmidt Decl., ¶ 26, 28, Doc. 19-35, p. 5).

### III.    ARGUMENT

#### A. Summary Judgment Standard

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Federal Rule of Civil Procedure 56(a).  When the moving party has carried its burden, the nonmoving party must "go beyond the pleadings" and establish that there is a material fact in genuine dispute.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 324-25 (1986).  A fact is material if it may affect the outcome of the suit under the governing law.  *Allen v. Tyson Foods*, 121 F.3d 642, 646 (11th Cir. 1997).  A material fact is in genuine dispute if a reasonable jury could return a verdict

in favor of the nonmoving party. *Fucron v. Mail Ctrs. Plus, LLC*, 843 F.3d 1295, 1303 (11th Cir. 2016).

The non-moving party must "identify affirmative evidence" that creates a genuine dispute of material fact. *Crawford-El v. Britton*, 523 U.S. 574, 600 (1998). The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp*., 475 U.S. 574, 586 (1986).  Moreover, "mere conclusions and unsupported allegations are legally insufficient to defeat a summary judgment motion." *Ellis v. England*, 432 F.3d 1321, 1326 (11th Cir. 2005) (citing *Bald Mountain Park, Ltd. v. Oliver*, 863 F.2d 1560, 1563 (11th Cir. 1989)).  Where a non-movant's response is comprised merely of nothing "more than a repetition of his conclusional allegations," summary judgment is required. *Comer v. City of Palm Bay, Fla*., 265 F.3d 1186, 1192 (11th Cir. 2001) (quoting *Morris v. Ross*, 663 F.2d 1032, 1034 (11th Cir. 1981)).

## B. Plaintiff's Discriminatory Termination Claim Fails as a Matter of Law

To make out a prima face case of gender discrimination under Title VII, a plaintiff must show (1) she belongs to a protected class; (2) she was qualified to do the job; (3) she was subjected to adverse employment action; and (4) her employer treated similarly situated employees outside her class more favorably. *Lewis v. City*

*of Union City, Ga*., 918 F.3d 1213, 1220-21 (11th Cir. 2019). To satisfy the similarly situated element, a plaintiff must show that she and her comparators are "similarly situated in all material respects." *Id*. at 1226. A similarly situated comparator is an employee who engaged in the same basic conduct as the plaintiff, was subject to the same employment policy, guideline, or rule, had the same supervisor, and who shared the plaintiff's employment or disciplinary history. *Id*. at 1227-28.

If a plaintiff establishes a prima facie case, the burden shifts to the employer to articulate a legitimate, nondiscriminatory reason for its action. *Id*. at 1221. It may be a subjective one, as long as the employer articulates a "clear and reasonably specific factual basis upon which it based its subjective opinion." *Chapman v. AI Transp.*, 229 F.3d 1012, 1034 (11th Cir. 2000) (*en banc*). If the employer meets that burden, the plaintiff must then demonstrate that the proffered reason is merely a pretext for unlawful discrimination—an obligation that merges with plaintiff's ultimate burden of proving that she has been the victim of intentional discrimination. *Lewis*, 918 F.3d at 1221.

Therefore, at a minimum, Plaintiff would have to identify a similarly situated employee who performed equally poorly, but was not terminated in order to establish a prima facie case. Plaintiff cannot do so and instead simply insists that she believes there was nothing wrong with her performance. Accordingly, she cannot establish a prima facie case and summary judgment is mandated. *See, e.g., Tolbert v. Briggs*

*and Stratton, Corp*., 256 F. App'x 340, 341-42 (11th Cir. 2007) (affirming summary judgment where plaintiff merely asserted his performance was not poor and presented no evidence of other employees who performed equally poorly but were not terminated).

Even if Plaintiff can adduce sufficient evidence of a prima facie case, Defendant acted on the basis of legitimate, nondiscriminatory reasons that were not pretextual as a matter of law. Poor job performance is a legitimate, non-discriminatory reason for terminating an employee. *See, e.g., Rosenfield v. Wellington Leisure Products, Inc*., 827 F.2d 1493, 1496 (11th Cir. 1987); *Jarvis v. Siemens Med. Sols. USA, Inc*., 460 F. App'x 851, 856 (11th Cir. 2012); *Tolbert v. Briggs & Stratton, Corp*., 256 F. App'x 340, 342 (11th Cir. 2007).  Moreover, the long-term initiative with which Schmidt was charged in the Fall of 2018, to increase the velocity of design work, meant that the company could not provide extra help or time to particularly slow learners.  (Ex. C--Schmidt Decl., ¶ 5, 6, Doc. 19-35, p. 1). Against this backdrop, Schmidt concluded that Plaintiff's work was inaccurate, her production was inadequate, her development was too slow, and she did not have the capacity to improve satisfactorily did not believe that Plaintiff could improve enough to assist the company with this initiative.  (Ex. C--Schmidt Decl., ¶ 7, Doc. 19-35, p. 2).  This is clearly legitimate and nondiscriminatory.

To show pretext, Plaintiff must demonstrate "such weaknesses, implausibilities, incoherencies, or contradictions in the employer's proffered legitimate reasons for its actions that a reasonable factfinder could find them unworthy of credence." *Gogel v. Kia Motors Mfg. of Ga., Inc*., 967 F.3d 1121, 1136 (11th Cir. 2020 (*en banc*) (quoting *Jackson v. Ala. State Tenure Commission*, 405 F.3d 1276, 1289 (11th Cir. 2005)). To show pretext, Plaintiff must show that the employer's reason is false "*and that discrimination was the real reason*." *Thomas v. STERIS Corp*., 819 F. App'x 741, 744 (11th Cir. 2020) (quoting *St. Mary's Honor Ctr. v. Hicks*, 590 U.S. 502, 515 (1993)). "[T]he plaintiff cannot recast the reason but must meet it head on and rebut it." *Holland v. Gee*, 677 F.3d 1047, 1055 (11th Cir. 2012). To avoid summary judgment the plaintiff "must introduce significantly probative evidence showing that the asserted reason is merely a pretext for discrimination. *Clark v. Coats & Clark, Inc*., 990 F.2d 1217, 1228 (11th Cir. 1993) (citation omitted) (emphasis in original). If the employer offers more than one legitimate, nondiscriminatory reason, the plaintiff must rebut each reason to survive a motion for summary judgment. *Chapman v. AI Transp*., 229 F.3d 1012, 1037 (11th Cir. 2000 (*en banc*).

Plaintiff asserts that her termination must have been discriminatory, because she believes there was nothing wrong with her performance. However, the law is clear that her conclusory self-assessment of performance is insufficient to establish

pretext. *See, e.g.*, *Alvarez v. Royal Atlantic Developers, Inc.*, 610 F.3d 1253, 1266 (11th Cir. 2010) ("Alvarez argues at length that Royal Atlantic's complaints about the quality of her work were unfounded, but the fact that she thinks more highly of her work performance than her employer is beside the point. The inquiry into pretext centers on the employer's beliefs, not the employee's beliefs and, to be blunt about it, not on reality as it exists outside of the decision maker's head); *Holifield v. Reno*, 115 F.3d 1555, 1565 (11th Cir. 1997) ("The inquiry into pretext centers upon the employer's beliefs, and not the employee's own perceptions of his performance"); *Rojas v. Florida*, 285 F.3d 1339, 1342 (11th Cir. 2002) ("[W]e must be careful not to allow Title VII plaintiffs simply to litigate whether they are, in fact, good employees.").

Here, Defendant has submitted an abundance of evidence of why it was not satisfied with Plaintiff's performance and had a legitimate belief that she was not progressing sufficiently to meet its business needs. "If the evidence shows that the 'employer [] w[as] dissatisfied with [the plaintiff] for…non-discriminatory reasons, even if mistakenly or unfairly so,' the employer is entitled to summary judgment." *Owens v. Governor's Office of Student Achievement*, 52 F.4th 1327, 1328 (11th Cir. 2022) (quoting *Alvarez*, 610 F.3d at 1266). Specifically, Plaintiff resisted training efforts by her manager, openly expressed frustration with her manager in front of other employees, was not taking direction from her manager, had communication

issues, was not timely completely projects, was not following proper protocol for customer submittals, was sending out e-mails with unclear instructions, was not grasping basic design concepts, could not do basic math, was relying too heavily on co-workers for help, and made a critical error on a design project with hollow steel ties (HST).  The latter error was so critical that it could have caused a train derailment if not corrected.  (Ex. C--Schmidt Decl., ¶ 22, Doc. 19-35, p. 4).  Plaintiff may attempt to dispute some, or even all of these deficiencies, but that is simply not legally sufficient to cast doubt on Schmidt's good faith reliance on them as legitimate reasons for her termination. *See, e.g., Elrod v. Sears, Roebuck & Co.*, 939 F.2d 1466, 1471 (11th Cir. 1991) ("Elrod may have convinced the jury that the allegations against him were untrue, but he certainly did not present evidence that Sears' asserted belief in those allegations was unworthy of credence.").

Furthermore, even if Plaintiff could show that Defendant erroneously evaluated her performance, that would likewise be insufficient for a showing of pretext. *See Moore v. Sears, Roebuck & Co.*, 683 F.2d 1321, 1323 n.4 (11th Cir. 1982) (explaining that an employer's good faith belief that an employee's work performance is unsatisfactory is not pretext, even if the employer was incorrect).  An employer may terminate an employee for a good reason, a bad reason, a reason based on erroneous facts, or for no reason at all, as long as it is not for a discriminatory reason. *Nix v. WLCY Radio/Rahall Communications*, 738 F.2d 1181, 1187 (11th

Cir. 1984). Courts do not sit as "super-personnel departments" second-guessing the wisdom of employers' business decisions. *Chapman v. AI Transp.*, 229 F.3d 1012, 1030 (11th Cir. 2000).

Quite simply, Plaintiff cannot raise a factual dispute that Schmidt is lying about the reasons for Plaintiff's termination, *and* did so in an effort to cover up sex discrimination. *See, e.g., Gibson v. Jet Blue Airways Corp*., No. 20-10943, 2021 WL 5368056, at *7 (11th Cir. Nov. 18, 2021) (explaining that the plaintiff did not present evidence that decision-makers were "lying or otherwise dishonest about their assessments of her performance" and did not show that the real reason was discrimination).

Tellingly, Plaintiff can offer no explanation, and certainly no substantial evidence, as to why Schmidt, as a female and the ultimate decision-maker, and McIntire, also female, had any bias, or motive to discriminate against her, on the basis of her gender. *See, e.g., Moulds v. Wal-Mart Stores, Inc*., 935 F.2d 252, 256 (11th Cir. 1991) (absence of discrimination where there was a black female on selection committee); *Velez v. Brown*, No. 95-1232-CIV-T-17B, 1997 WL 394895, at *3 (M.D. Fla. Jul. 8, 1997) (no race discrimination where promotion decisions made by a Hispanic); *Dudley v. Wal-Mart Stores., Inc*., 931 F. Supp. 773, 790 (M.D. Ala. 1996) (explaining that there was an absence of race discrimination where African-American was involved in decisional process); *see also Young v. Lehman*,

748 F.2d 194, 197 (4th Cir. 1984) (noting lack of discrimination because of presence of minorities on selection panel), *cert. denied*, 471 U.S. 1061 (1985); *Elrod*, 939 F.2d at 1471 (explaining that plaintiff faced a difficult burden in age case because all decision-makers were well over forty and more likely to be victims of age discrimination than its perpetrators).

Additionally, Schmidt and McIntire supported and were responsible for Plaintiff's employment to start with, which creates an inference of non-discrimination. *See, e.g., Gibson*, 2021 WL at *7 ("Schmidt hired Gibson knowing she was both Black and over the age of forty"); *Blue v. Dunn Const. Co. Inc.,* 453 F. App'x 881, 885 (11th Cir. 2011) (no discrimination where manager who demoted plaintiff was same manager who had promoted him); *Barreto v. SGT, Inc*., 826 F. App'x 267, 271 (4th Cir. 2020) (explaining that defendant entitled to inference of nondiscrimination where same decisionmaker promoted plaintiff less than two years before terminating her); *Chiaramonte v. Fashion Bed Group, Inc., a Div. of Leggett & Platt, Inc*., 129 F.3d 391, 399 (7th Cir. 1997) (same decision-maker presumption applied where same manager who hired plaintiff chose to retain him after a merger would fire him less than two years later out of an aversion to older people), *cert. denied*, 523 U.S. 1118 (1998); *Lowe v. J.B. Hunt Transport, Inc*., 963 F.2d 173, 175 (8th Cir. 1992) (no discrimination where same officials who hired plaintiff when he was 52 fired him two years later).

Plaintiff alleges that, on one occasion, McIntire diverted a work assignment she was given by the production department, gave it to "Jacob," and made a comment to the effect that "male production workers are more comfortable working with males." (Ex. A--Plaintiff's Depo., p. 195, Doc. 19-1, p. 50). While McIntire denies making any such comment (Ex. D--Corp. Rep. Depo. p. 60, Ex. 3, Doc. 19-36, p. 16, Doc. 19-39, p. 4), it is at best for Plaintiff, an alleged "stray comment" that does not indicate bias or discriminatory motive and was not connected to any material adverse action against Plaintiff. *See Jones v. Bessemer Carraway Med. Ctr.*, 151 F.3d 1321, 1323-& n.10 (11th Cir. 1998) (explaining that discriminatory comments made by plaintiff's supervisor insufficient circumstantial evidence of discrimination because they were not associated with events leading to plaintiff's termination); *Silvestri v. Jupiter Inlet Colony, Fla.*, 614 F. App'x 983, 984 (11th Cir. 2015) ("a stray remark, isolated and unrelated to the challenged employment decision, standing alone, is insufficient to establish a material fact on pretext."). Ultimately, Schmidt, not McIntire, made the decision to terminate Plaintiff's employment, and there is no evidence that Schmidt was aware of, or influenced by anything related to, this alleged comment. *See, e.g., Robertson v. Riverstone Communities, LLC*, 849 F. App'x 795, 807 (11th Cir. 2021) (explaining that manager's racist comment did not raise issue as to pretext where manager was not

primary or ultimate decision-maker and there was no evidence that other decision-makers were influenced by racial bias).

The only theory posited by Plaintiff as to why McIntire would discriminate against her on the basis of sex is that is that she (Plaintiff) was a young female and "maybe" she felt threatened that she would "accelerate" and become too successful. (Ex. A--Plaintiff's Depo., pp. 185-86, Doc. 19-1, pp. 47-48). However, when asked if she had any facts or information that would indicate that McIntire did anything to her because she is a female, she testified, "I guess I'm unsure." (Ex. A--Plaintiff's Depo., pp. 189-90, Doc. 19-1, pp. 48-49). Conclusory allegations, without more, however, are not sufficient to raise an inference of pretext where a defendant has offered extensive evidence of legitimate, non-discriminatory reasons for its actions. *Young v. General Foods Corp.*, 840 F.2d 825, 829 (11th Cir. 1988), *cert. denied*, 488 U.S. 1004 (1989).

Nor can Plaintiff argue that she was somehow singled out for adverse treatment. Schmidt was involved in the termination of two other Birmingham design engineers—a male and a female—demonstrating an absence of gender discrimination. (Ex. C--Schmidt Decl., ¶ 27, Doc. 19-35, p. 5). Other than those individuals and Plaintiff, Schmidt is not aware of any other engineers at the Birmingham facility whose performance has warranted termination. (Ex. C--Schmidt Decl., ¶ 27, Doc. 19-35, p. 5). Moreover, Schmidt promoted McIntire and

Taylor Sabol, both females, in Birmingham, which dispels any notion of bias against females. (Ex. C--Schmidt Decl., ¶¶ 3, 29, Doc. 19-35, pp. 1, 5). Finally, McIntire supported Sabol with positive performance evaluations, training, and merit increases which is further evidence that she has not same-sex animus. (Ex. C--Schmidt ¶ 29, Doc. 19-35, p. 5).

Defendant has proven that Plaintiff was terminated for legitimate non-discriminatory reasons, and Plaintiff has no competent substantial evidence to establish a comparator, to rebut Defendant's reasons, or to establish any unlawful motive. Therefore, her claim of discriminatory termination is due to be dismissed as a matter of law.

### C. There is no Hostile Environment Claim

Plaintiff's Complaint includes a singular "**CAUSE OF ACTION,**" and alleges generically, " Ismail experienced sex discrimination with respect to the terms and conditions of her employment which resulted in her termination in violation of 42 U.S.C. § 2000e, as amended." (Complaint ¶ 16). There are no allegations of sex-based harassment, hostile work environment, or the elements thereof, anywhere in the Complaint. Defendant therefore submits that Plaintiff has not sufficiently alleged any such claim.

However, Plaintiff has asserted in other court submissions that "she was subjected to a sexist work environment." (*See, e.g.,* Dkt. 10). To the extent Plaintiff

has asserted any such claim (which Defendant denies), she simply has no evidence sufficient to establish such a claim. To establish a claim for sex-based hostile work environment, Plaintiff must prove (1) that she belongs to a protected group; (2) that she has been subject to unwelcome sexual harassment, such as sexual advances, requests for sexual favors, and other conduct of a sexual nature; (3) that the conduct was based on her sex; (4) that the harassment was sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatorily abusive working environment; and (5) a basis for employer liability. *Mendoza v. Borden, Inc.*, 195 F.3d 1238, 1245 (11th Cir. 1999) (*en banc*), *cert. denied*, 529 U.S. 1068 (2000).

There is nothing about the conduct Plaintiff attributes to McIntire, or anyone else, that is related to sex or gender. At worst, Plaintiff simply describes an allegedly heavy-handed supervisor—there are no allegations of any gender-biased comments and no evidence that she acted differently around male employees. "Title VII is not a general civility code; ordinary tribulations of the workplace, such as sporadic use of abusive language, gender-related jokes, and occasional teasing cannot form the basis of a claim for actionable harassment or hostile work environment. Instead, conduct must be extreme to amount to a change in terms and conditions of employment. Title VII is not a shield against harsh treatment in the workplace; personal animosity is not the equivalent of [gender] discrimination." *Corbett v.*

*Beseler*, 635 F. App'x  809, 816 (11th Cir. 2015) (internal quotation marks and citations omitted).  Non-sexual, non-gender-based harassment does not establish a claim of sexual harassment. *See Reeves v. C.H. Robinson Worldwide, Inc.,* 594 F.3d 798, 809 (11th Cir. 2010) (*en banc*).

Plaintiff's testimony clearly establishes that the conduct of which she complains had absolutely nothing to do with gender, and in fact Plaintiff attributes it instead to a personal disagreement.  The law is clear that "[p]ersonal animosity is not the equivalent of sex discrimination and is not proscribed by Title VII." *McCollum v. Bolger*, 794 F.2d 602, 610 (11th Cir. 1986), *cert. denied*, 479 U.S. 1034 (1987).  Plaintiff testified that everything was "fine" between her and McIntire until she said something that upset McIntire in the context of them doing something together socially—according to Plaintiff, McIntire was apparently offended at the idea that she (Plaintiff) did not appreciate the fact that McIntire had made time to show her around Birmingham.  (Ex. A--Plaintiff's Depo., p. 204, Doc. 19-1, p. 52).  As Plaintiff testified, the conversation, "carried on into the workplace and throughout my life." (Ex. A, Plaintiff's Depo., p. 204, Doc. 19-1, p. 52).  Therefore, because personal tension with McIntire, not sex, was the reason for Plaintiff's perception of hostility, she has no actionable sexual harassment claim.  *See, e.g., McAboy v. Westervelt Co*., No. 7:17-cv-000813-LSC, 2018 WL 6504511, at *11 (N.D. Ala. Dec. 11, 2018) (granting summary judgment where plaintiff and alleged

harasser were good friends until alleged harassment did not start until after alleged harasser moved to a different department).

Even if Plaintiff had presented evidence of sex-based harassment, it is clear that it is not "severe or pervasive." *See, e.g., Webb-Edwards v. Orange County Sheriff's Ofc.,* 525 F.3d 1013, 1027-28 (11th Cir. 2008) (supervisor's statement that plaintiff "looked hot," that she would be "better if she'd wear tighter clothes," and a statement about what he was sexually doing to his wife not severe or pervasive), *cert. denied,* 555 U.S. 1100 (2009); *Baldwin v. Blue Cross/Blue Shield of Alabama,* 480 F.3d 1287, 1302 (11th Cir. 2007) (supervisor propositioning plaintiff, asking her to spend the night in his hotel room, cornering her in his office, and approaching her from behind and breathing down her neck not sufficiently severe), *cert. denied*, 552 U.S. 991 (2007); *Mitchell v. Pope,* 189 F. App'x 911, 913-14 & n.3 (11th Cir. 2006) (supervisor describing sexual effect plaintiff had on him, saying "your ass sure looks fine," trying to kiss plaintiff, lifting plaintiff over his head, rubbing up against plaintiff and reaching across her chest not severe or pervasive). Clearly, the conduct alleged by Plaintiff pales in comparison to conduct found to be actionable. For example, a few legitimate requests to Plaintiff to wear appropriate attire, suitable for a professional and manufacturing environment, is not based on sex and does not create an actionable, severe and pervasive, hostile work environment. Accordingly, if Plaintiff has stated a harassment claim, it is nonetheless due to be dismissed.

## IV.    CONCLUSION

For the foregoing reasons, there are no genuine issues of material fact for trial in this action, and Defendant is entitled to judgment on all claims as a matter of law.

Respectfully submitted on this 28th day of February, 2023.

**COUNSEL FOR DEFENDANT**

/s/ F. Daniel Wood Jr.
F. Daniel Wood Jr. (ASB-6822-D65F)
John W. Sheffield (ASB-7423-D62J)
THE KULLMAN FIRM
600 University Park Place, Suite 340
Birmingham, AL 35209
T: 205-871-5858 | F: 205-871-5874
fdw@kullmanlaw.com
jws@kullmanlaw.com

## <u>CERTIFICATE OF SERVICE</u>

I certify that on the 28th day of February, 2023, I filed the foregoing using the electronic CM/ECF system, which will send notice to the following:

**<u>PLAINTIFF'S COUNSEL</u>**
Lee David Winston, Esq.
WINSTON COOKS, LLC
505 20th Street North, Suite 815
Birmingham, AL 35203
P: 205-482-3551 | Fax: 205-278-5876
lwinston@winstoncooks.com

*/s/ F. Daniel Wood Jr.*
OF COUNSEL